UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| Robert T. DeBarr, | ) | CASE NO. 1:11 CV 2814 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Cleveland Clinic Foundation, | ) | Memorandum of Opinion and Order |
| | ) | |
| Defendant. | ) | |

### Introduction

This matter is before the Court upon defendant's Motion for Summary Judgment

(Doc. 11).  This case alleges that defendant discriminated against plaintiff on the basis of age

when it forced him to resign or constructively discharged him from employment. For the

following reasons, the motion is GRANTED.

### Facts

Plaintiff Robert T. DeBarr filed this Complaint against defendant Cleveland Clinic

Foundation (hereafter, defendant or the Clinic).  Defendant is a not-for-profit, multi-specialty

academic medical center that integrates clinical and hospital care with research and education.

It maintains and enforces a Non-Discrimination, Harassment, or Retaliation policy.  As part

1

of its Corporate Compliance program, the Clinic maintains a confidential reporting hotline through which its employees can anonymously report any workplace issues.  (Lisa Ullman aff.)

Plaintiff was hired by the Clinic in April 1991, at age 53, as a Network Technician in the ITD Telecommunications department.  He was promoted to Lead Network Technician in 2000, at age 63.  (pltf. depo., Exs.)  Plaintiff performed well in these two positions which were both part of the ITD division. At all times during his employment, plaintiff reported directly to Deloss Martin.  Martin had participated in the decision to hire plaintiff, and he was manager of the Telecom Operations department during the events at issue here. (Deloss Martin aff.)

In 2008, the Clinic restructured the ITD Telecommunications department and added a new level of management between Martin's managerial role and the Lead Network Technicians.  As such, three Manager II positions were created, each reporting to Martin. Plaintiff, at age 71,  was promoted to a Manager II position in January 2008.  Martin participated in the promotion decision, along with Director of Telecommunications Services Gary Holkovic and Senior IT Executive Adam Fogleman.  (*Id*.)  The two other employees who were promoted to Manager II were women, ages 56 and 59.  (Ullman aff. Ex. A)  In this new position, plaintiff supervised 14 employees in the ITD Telecommunications department. Most of these employees were over the age of 50, and four were over 60. (Ullman aff.) During this time, the Clinic expanded the main campus into the heart center.   The telecommunication telephone and data systems were installed on time and on budget, and there were no problems with productivity. (Holkovic depo.)

2

According to Lisa Ullman (the Clinic's Human Resources (HR) Consultant at that time), Gary Holkovic (the Clinic's Director of Telecommunications Services), and Martin, the ITD Telecommunications department experienced problems after plaintiff assumed the Manager II role. (affs. Martin, Ullman, Holkovic) He had difficulty staffing projects, communicating with his staff, and monitoring employee productivity and time keeping. (Martin aff.)

Between July 2009 and May 2010, the Clinic received four anonymous complaints through its Corporate Compliance hotline regarding a variety of issues alleged to be occurring in the ITD Telecommunications department, and employees informally brought forward complaints as well. (affs. Ullman and Holkovic ) The complaints concerned issues with violations of the no smoking policy, the inequity in the quality and quantity of work being assigned, and the perceived abuse of the Clinic's overtime and flex time policies. With respect to overtime, employees voiced concerns regarding the process by which overtime was assigned and about the so-called "banking" of overtime, which was a practice of charging overtime for overtime-eligible work, even where the work could have been accomplished during straight time hours. (Ullman aff.)  Ullman created a time-line of the compliance complaints, two of which named Holkovic. (Ullman depo. Ex. 16)

In response to the complaints, Ullman spoke with a number of Network Technicians in the ITD department and found that the employees were dissatisfied with the overall management of the department. Human Resources reinforced and re-educated plaintiff and his employees regarding its applicable policies and effectively put a stop to the overtime banking. Plaintiff was not disciplined as a result of any of these complaints. (Ullman aff.)

3

According to Martin, he began to counsel plaintiff in April 2010 in an effort to improve plaintiff's performance as a manager. On April 4, 2010, Martin met with plaintiff and presented his performance evaluation for the 2009 fiscal year, which downgraded Plaintiff's overall performance rating to the second lowest level – "meets most expectations." Although the evaluation stated that plaintiff "in his customary way was adept at completing all assigned projects and quickly addressed repair incidents and many unplanned last minute phone orders as expeditiously as possible," it indicated that he needed to "improve upon his managerial skills." In addition to the performance evaluation, Martin provided plaintiff a type-written document titled "Evaluation Improvement Recommendations" that listed specific areas in which improvement was needed.  Martin counseled plaintiff to improve upon his leadership skills and to communicate more frequently with his staff in an effort to understand and provide feedback regarding their individual issues. Martin also addressed plaintiff's deficiencies with respect to monitoring employee time (including overtime) and productivity. (Martin aff.; Ex.)

Plaintiff had received the highest rating of "exceptional performance" in the previous year's evaluation, and Martin had noted thereon:

> [Plaintiff] did a very outstanding job controlling two large projects, Heart and Glickman as well as making certain that all smaller scale projects, repairs and work orders were accomplished as expeditiously as possible.  Bob was put upon on a daily basis to juggle work assignments and personnel to met the frequent last minute urgent telephone orders that were mandated to complete.  He deserves an exceptional rating due to his numerous accomplishments through out [sic] the year.

(Doc. 16 Ex. 14)

Martin met with plaintiff again in July 2010, after having seen little improvement on plaintiff's part and having received information from Holkovic and Ullman concerning

4

additional employee complaints. Issues with leadership, communication, and time-keeping again were discussed during this meeting.  Martin also counseled plaintiff to "clean up [his] language – especially profanity" in the workplace.  (Martin aff.)  Martin made handwritten notes of the meeting.  (*Id.* Ex. C)

The corporate compliance complaints regarding the ITD Telecommunications department continued in August 2010, which prompted  Human Resources to determine that a formal investigation was warranted.  Because the complaints received had been anonymous and not directed specifically at plaintiff, the investigation was designed to uncover issues regarding the management and functioning of the department as a whole. Ullman, along with two other experienced HR Generalists, conducted the investigation which lasted several days during which time all of the Network Technicians in the ITD Telecommunications department were interviewed.  The investigation revealed continued complaints by certain members of the department regarding plaintiff's management skills (e.g., his lack of leadership, his lack of communications, and his inability to monitor time and productivity of his staff). Of more concern to Ullman was that the investigation revealed that plaintiff had openly made racist, sexist and classist comments to his staff.  (Ullman aff.)

According to Ullman, "a group of more vocal employees (including John Chyben, John Golden, Ryan Gray, and Daniel Zenbauer), who were dissatisfied with the current management structure," were largely responsible for bringing forward the comments made by plaintiff. Ullman made handwritten notes summarizing her findings:

Inappropriate language of a racial nature- comments about African Americans and in presence of department staff

- hand gestures to indicate a person[']s skin color

5

> - Al forgot his headset.  Bob rubbed his skin on his hand and said 'I suppose this is going to be an issue'
> - While riding to Parker with subordinate- Bob made the comment 'run this n.... over'
> - 'Dan was blacker than Chris because Dan lives in Collinwood.  Chris is whiter than Dan because he lives in Cleveland Hts.
>
> Using profane language in the work area.  'Gary is an asshole'.
>
> - Offensive jokes.
> - Refers to people as 'rednecks'.
> - Woman referred to as broads, bitches.
>
> Implied that Chris Scott and Dan Zenbauer were gay since they had been working closely together.

The notes are signed by Ullman and dated October 17, 2010.  (Ullman aff.; Ex. C.).

As part of the investigation, typed questionnaires were completed by the Network Technicians. These are submitted via affidavit by Ullman.  For instance, John Chyben, who was 61 years old at the time of plaintiff's termination and had previously worked with plaintiff at another employer, reported on his questionnaire that plaintiff "took mgr. job and has changed" and "can be abrasive."  He noted, "offensive jokes → living in 1950 - 'rubbing skin' women → referred to as broads- made inappropriate comments about black people." (Ullman decl. Ex.B) Dan Zenbauer, age 34, noted plaintiff's comment "why are you guys working together are you guys gay," and "I'm blacker than Chris- Chris whiter than you- Dan comes from Collinwood, Chris comes from Cleve. Hts."  He also reported the comment about "run these n...s over" and "says Gary is an 'asshole.' "  (*Id.*)

Ullman presented the Human Resources' findings to Martin, Holkovic, and Adam Fogleman (Senior IT Executive). Together, the group determined that termination was warranted, but that in light of his years of service, plaintiff would be given the opportunity to

resign.  On October 18, 2010, Ullman, Holkovic, and Martin met with plaintiff, informed him of the findings, and gave him the opportunity to resign which he accepted. (affs. Ullman, Martin, Holkovic) Ullman avers that when discussing the allegations concerning his race-based comments, she recalled that plaintiff responded that it "must have been what I said to Al," the latter being an African American employee supervised by plaintiff. David Schuetz, age 54, replaced plaintiff. (Ullman aff.)

Plaintiff thereafter filed this Complaint setting forth one claim for discrimination under the Age Discrimination in Employment Act (ADEA).  This matter is now before the Court upon defendant's Motion for Summary Judgment. [1]

### **Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its

---

[1]    Defendant also moves for summary judgment on a hostile work environment claim, but none was alleged.  Defendant acknowledges in its reply brief that plaintiff does not address such a claim and, therefore, abandons it. Nonetheless, no claim was asserted.

resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported
> as provided in this rule, an adverse party may not rest upon the
> mere allegations or denials of [his] pleadings, but [his
> response], by affidavits or as otherwise provided in this rule,
> must set forth specific facts showing that there is genuine issue
> for trial.  If he does not respond, summary judgment, if
> appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most

favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th

Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562

(6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must

"produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53

F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence

of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57

F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the

evidence is "merely colorable" and not "significantly probative," the court may decide the

legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

The Sixth Circuit has recently re-capped the applicable standard in reviewing claims

for age discrimination brought under the ADEA:

> To establish an ADEA claim, an employee must show either direct or indirect evidence of age discrimination. 'Direct evidence is evidence that proves the existence of a fact without requiring any inferences.' *Rowan [v. Lockheed Martin Energy Sys., Inc*., 360 F.3d [544]at 548 [(6th Cir. 2004)]. It is 'evidence from the lips of the defendant proclaiming his or her ... animus.' *Smith v. Chrysler Corp*., 155 F.3d 799, 805 (6th Cir.1998) (internal quotation marks omitted). Alternatively, to show discrimination by means of indirect or circumstantial evidence, an employee must make out a prima facie case of discrimination under the *McDonnell Douglas* approach. An employee must show that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position held; and (4) she was replaced by or treated less favorably than someone outside of the protected class. *See Tuttle v. Metro. Gov't of Nashville,* 474 F.3d 307, 317 (6th Cir.2007). If an employee makes out a prima facie case, 'the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action.' *Schoonmaker [v. Spartan Graphics Leasing, LLC*], 595 F.3d [261]at 264 [(6th Cir. 2011)]. If the employer does so, the burden of production shifts back to the employee to show that the employer's stated reason was mere pretext. *Id*. During this time, however, the burden remains on the employee to show that age was the but-for cause of the adverse employment action. *Id*. (citing *Geiger v. Tower Auto*., 579 F.3d 614, 620 (6th Cir.2009)).

*Diebel v. L & H Resources, LLC,* 2012 WL 2817948 (6th Cir. July 10, 2012).

**(1) the prima facie case and direct evidence**

Defendant concedes that plaintiff establishes a prima facie case through the

circumstantial method, and disagrees that he presents direct evidence of age discrimination.

In any event, defendant asserts, plaintiff fails to establish pretext.

Plaintiff argues he has direct evidence of age discrimination.[2]  "[D]irect evidence is

---

[2]      "Direct evidence of discrimination, if credited by the fact finder, removes the case from *McDonnell Douglas* because the plaintiff no longer needs the inference of discrimination that arises from the prima facie case." *Beery v. Associated Hygienic Products, LLC*, 243 Fed.Appx. 129 (6th Cir. 2007) (citing *Talley v.*

9

that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 926 (6th Cir.1999)). Such evidence "does not require a fact finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* "Any discriminatory statements must come from decision makers to constitute evidence of discrimination. Statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden ... of demonstrating animus." *Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009) (internal citations and quotations omitted).

The Sixth Circuit has recently reiterated that in ADEA cases,

> allegedly discriminatory remarks are evaluated by considering four factors: (1) whether the statements were made by a decision maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Diebel v. L&H Resources, LLC,* 2012 WL 2817948 (6th Cir. July 10, 2012) (internal quotations and citations omitted). Plaintiff points to the following evidence.

Plaintiff testified that Gary Holkovic questioned him about his retirement in 2008, later when work was being done on the Clinic's new heart center, and possibly a third time also in the context of the heart center.  In particular, plaintiff testified that Holkovic "come

---

*Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1248 (6th Cir.1995)).

10

over to me and he said, are you going to retire?  I said, no, I'm going to be here.  I have no

intentions of retiring.  I says, if I'm going to retire, I'll let you know five years in advance.

And he says, you're kidding.  I said, no, I - I enjoy the job.  I don't like to sit home."   A

couple years later when work was being done on the heart center "he [Holkovic] come up and

he said, are you ready to retire now?  You got your big job.  No, I'm not.  And I told him my

same answer.  I said, I plan on - I'll let you know five years in advance, okay."  Finally,

"There may have been a third time" when Holkovic made the "same type of comment" such

as "you've done everything, are you ready to retire? I go no."  (pltf. depo. 58, 60, 132-135)

Holkovic testified that he did have a conversation with plaintiff wherein he asked him

if he was going to retire or "something to the effect of how long are you going to

work."(Holkovic depo. 58, 59)

Holkovic's comments are not direct evidence of age discrimination because they do

not require the conclusion that plaintiff was terminated because of his age, and require

inferences by a fact finder.  *See Hale v. ABF Freight System, Inc.,* 2012 WL 5259156 (6th Cir.

Oct. 25, 2012) (Plaintiff's immediate supervisor's two inquiries as to when plaintiff was

planning to retire and whether he had thought more about retirement were not direct evidence

of age discrimination because they did not require the conclusion that plaintiff was terminated

because of his age, and retirement and age are not synonymous.); *Diebel, supra* (The

company president's alleged single  inquiry into when plaintiff was going to retire was not

direct evidence as it was unrelated to the employment decision and was too remote in time.)

Next, plaintiff points to Holkovic's deposition testimony that he heard comments that

plaintiff "is old school."  (Holkovic depo. 53) And, when asked whether plaintiff is "old

11

school," Ullman testified, "Old school in relation to using offensive remarks, I would say yes."  (Ullman depo. 94)

Holkovic and Ullman were decision makers, but plaintiff's evidence does not even show that they made these comments, let alone that they were related to the decision-making process.  Notwithstanding, even if they had referred to plaintiff as "old school," the comment is ambiguous at best and would clearly require an inference to conclude that this referred to age.

Plaintiff also asserts that co-workers, whom he characterizes as a "gang of four younger men," referred to him on their questionnaires as being "old school," "from the 1950's," and "part of a good old boys club."  Plaintiff argues that these comments demonstrate an age bias toward him by those who wanted him out.

These comments are likewise insufficient to establish direct evidence as they are not made by decision makers and  require a fact finder to draw inferences.  As addressed above, Ullman had identified John Chyben, John Golden, Ryan Gray, and Daniel Zenbauer as the employees who brought forward plaintiff's inappropriate comments. Initially, it should be noted that these employees were ages 61, 56, 47, and 33. (Ullman aff. Ex. A) Nonetheless, plaintiff cannot take these remarks out of context in an attempt to establish direct evidence. Even construing the evidence in plaintiff's favor, the interview notes show that the remarks were not related to plaintiff's age but rather to his out-of-date views regarding certain groups of people.  There is no evidence that the four employees' feelings and reports about plaintiff had anything to do with his age.   In fact, plaintiff's brief characterizes these men as having "a vendetta against" plaintiff. And, when asked at deposition whether he thought these

individuals were seeking to retaliate against him with racist allegations because of his age or because he would not bend the rules on overtime, plaintiff responded, "Probably wouldn't bend the rules... on overtime."  (pltf. depo. 141-142)

Plaintiff further contends that these employees influenced the decision to terminate plaintiff.  Plaintiff argues that when a decision maker is influenced by another who is motivated by age-bias, defendant can be held liable under a "cat's paw" theory.   Plaintiff relies on *Ercegovich v. Goodyear Tire & Rubber,* 154 F.3d 344 (6th Cir. 1998), wherein the Sixth Circuit recognized that discriminatory remarks made by those who may have played a role in or influenced the adverse decision may be relevant.  The court noted that "remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, were relevant."  In *Ercegovich*, the court found that comments made by the vice-president of plaintiff's division were relevant given that he could have been involved in or influenced the decision.  But, as discussed above, there is no evidence that the four employees made age-biased remarks.  Even if they did, unlike *Ercegovich*, the alleged bias here involves plaintiff's non-supervisory subordinates and not a supervisor who could have influenced the employment decision.  Plaintiff points to no support that this theory has been extended to non-supervisory employees such as those involved here.

Finally, plaintiff asserts that Ullman "rubber stamped" the allegations made by the four younger co-workers and, therefore, acted as a conduit of them.  However, as discussed above, the investigation was conducted by three experienced HR Generalists, including Ullman.  There is no evidence that Ullman, or the other two, ever made any ageist comments

13

or took ageist actions against plaintiff or anyone.

For these reasons, plaintiff fails to establish direct evidence of age discrimination.

**(2) pretext**

Because it is undisputed that plaintiff has set forth a prima facie case through the circumstantial method, the Court proceeds to determine whether pretext has been demonstrated.

Defendant has set forth a legitimate reason for plaintiff's termination, i.e., his unlawful workplace comments. (Doc. 11 at 12) "To ultimately prevail in the case, [plaintiff] must 'prove by a preponderance of the evidence' that [the defendant's asserted reasons] were 'in fact a pretext designed to mask illegal discrimination.' " *Diebel, supra* (citing *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 489 (6th Cir.2000)). Plaintiff can do so by demonstrating that (1) defendant's stated reason for terminating him has no basis in fact, (2) the reason offered for terminating him was not the actual reason for the termination, or (3) the reason offered was insufficient to explain defendant's action." *Id.* (citing *Spengler v. Worthington Cyclinders*, 615 F.3d 481, 493 (6th Cir.2010)).

Plaintiff points to his own deposition testimony wherein he generally denies making the comments or gestures alleged. (pltf. depo. 109-124) But, at a minimum, plaintiff acknowledged at deposition that he may have referred to females as broads or bitches. (*Id.* 115) Moreover, the comments were reported and recorded on the questionnaires.  Plaintiff's own deposition testimony would seem to be only a self-serving attempt to defeat them. Additionally, as discussed below, the testimony of one African American employee taken in discovery has confirmed many of the allegations.

14

Plaintiff asserts that the only technicians who accused him of making the inappropriate comments were John Chyben, John Golden, Ryan Gray, and Daniel Zenbauer whom the other technicians had  identified as the individuals in the department who were disruptive, "trouble causers," and had a "vendetta against management."  For instance, plaintiff points to the Lead Tech's interview notes wherein he stated what he liked least in his role was dealing with individual personalities, "four individuals in particular [Chyben, Golden, Gray, and Zenbauer] - create drama- out to get everything from CC- complain about things they shouldn't."  (Doc. 16 Ex. 24) However, as discussed above, there is no evidence that these individuals' allegations were motivated by age bias rather than a dissatisfaction with management.  The fact that they were disruptive, caused trouble, or were out to get management does nothing to show that they fabricated their allegations because of age bias.

Nevertheless, the Court agrees with defendant that, at a minimum, it is entitled to the benefit of the honest belief rule. The Sixth Circuit has recognized,

> Under this rule, if an employer demonstrates an honest belief in its proffered reason for the adverse employment action, the inference of pretext is not warranted... [A]n employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact. Moreover, so long as the employer has established its honest belief, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.

*Tibbs v. Calvary United Methodist Church,* 2012 WL 5861725 (6th Cir. Nov. 20, 2012) (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274 (6th Cir. 2012).

Here, the defendant's investigators reasonably relied upon the particularized facts

brought forward by the employees concerning plaintiff's workplace comments and conduct in making their decision.  As discussed below, the allegations have been confirmed in discovery by at least one employee.  More importantly, plaintiff fails to show that defendant's belief was not honestly held.

Plaintiff argues that Ullman's belief was not honestly held given that she admits that Holkovic, Mark Bobnar, and Martin were not disciplined regarding overtime issues.  But neither was plaintiff. Additionally, this assertion is discussed more fully below in connection with plaintiff's assertions regarding pretext.

Plaintiff also attempts to undermine Ullman's honestly held belief by pointing out that she acknowledged that women and African Americans liked plaintiff and did not report any inappropriate behavior.  Plaintiff, however, admitted to using derogatory terms for women and an African American employee confirmed in discovery plaintiff's use of inappropriate comments even though he was not offended.  Plaintiff points out that according to Ullman's deposition testimony, none of the three African American employees in the department ever complained of any racial issues.  (Ullman depo. 82) However, Christopher Scott, one of the African Americans who reported to plaintiff, testified at deposition that he did not have any issues or complaints with plaintiff, but that he saw plaintiff rubbing his hand on his skin to indicate a person of color, heard him referring to women as broads and joke about Scott and another employee being gay, used the term redneck, and confirmed plaintiff's comment about two employees who were "blacker" or "whiter" depending on where they lived.  But, Scott took no personal offense, and observed that plaintiff treated women and African Americans fairly.  (Sciott depo. 38-47)

16

Plaintiff cannot honestly argue that defendant should not have taken the action it did even if it knew employees were not offended by plaintiff.  Defendant maintained a non-discrimination and harassment policy.  To say that it should have overlooked the inappropriate comments of a manager because subordinates did not report being offended by them would be substituting this Court's judgment for that of defendant. This Court is not permitted to do so.  *Gulley v. County of Oakland,* 2012 WL 3668001 (6th Cir. Aug. 27, 2012) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir.2000)) ("As we have oft times repeated, 'it is inappropriate for the judiciary to substitute its judgment for that of management.' "); and *Id.* (quoting *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir.1982) ("The ADEA was not intended as a vehicle for judicial review of business decisions. The plaintiff-employee must provide evidence not that the defendant-employer could have made a business decision that others might think more fair, but that the defendant-employer made the decision to terminate him because of his membership in a protected class").

Finally, plaintiff points to a compliance complaint which referred to a "lie and deny"atmosphere under Holkovic, and asserts that Ullman's inability to provide an explanation calls into question her own honesty in plaintiff's investigation.  This is mere conjecture and there is no basis to question Ullman's honesty on this basis.

In further support of pretext, plaintiff asserts that Chyben, Golden, Gray, and Zenbauer did not report plaintiff's inappropriate comments to Human Resources or the corporate compliance hotline.  The failure to do so does not mean that these employees dishonestly reported comments made by plaintiff on their interview questionnaires, or that

17

defendant should not have relied upon them.

Plaintiff asserts that although hotline complaints were received about Mark Bobnar and Gary Holkovic, individuals younger than plaintiff, Ullman did not investigate or found no merit to the complaints.  Nor, plaintiff asserts, were Holkovic, Bobnar, or Deloss Martin disciplined for management issues regarding overtime hours.  Plaintiff contends that a complaint was received involving Holkovic regarding "some of the same things that [plaintiff] was terminated for ... flex time, PTO, and overtime policy, but Holkovic was not investigated."  (Doc. 16 at 5)  However, the fact that others were not similarly disciplined is immaterial because neither had plaintiff been disciplined for the issues that came forward through the compliance complaints (i.e., overtime, smoking in the van, etc.). (Ullman aff. ¶ 13)  Plaintiff was not terminated for the issues brought forward in the complaint against Holkovic. Rather, the complaints sparked the investigation of the department as a whole which revealed the basis for which plaintiff was terminated (i.e, his inappropriate comments).

Ullman did testify that the overtime issue was considered in making the decision to terminate plaintiff. (Ullman depo. 52-53)   However, there is no evidence that Holkovic engaged in the offensive workplace comments which raised the most concern to Ullman. Plaintiff also points out that a complaint was received that Mark Bobnar was, *inter alia,* mistreating female co-workers and that Ullman investigated but found no merit to the complaint. But, Bobnar is a Lead Technician, and not a manager, and there is no evidence that the conduct was similar to plaintiff's.  (Ullman depo. 59-70)

Plaintiff asserts that although defendant complains that he was a bad manager, his productivity and results were lauded for the previous 19 years, and he had not received any

18

complaints.  As discussed above, defendant agrees that plaintiff performed well in his previous positions.  Once he became a manager, however, the evidence shows that his supervisor Deloss Martin, who was 63 years old at the time of plaintiff's termination and had participated in the decisions to hire, promote, and terminate plaintiff, downgraded his performance evaluation rating due to his managerial performance, counseled him as to how to improve, and met with him on another occasion to address his performance.  Furthermore, the fact that Martin was not that much younger than plaintiff would tend to discredit plaintiff's belief that he discriminated against him based on age.  *See Garrett v. Ameritech Services, Inc.,* 2011 WL 902095 (E.D.Mich. 2011) (citing *Howell v. Canton City Sch. Dist. Bd. of Educ.*, 1997 WL 413630 (6th Cir. Jul.17, 1997)) ("Cases have held that when the decision maker is in the same protected class as the plaintiff, an inference of discrimination is weakened or the likelihood of discrimination is lessened.")

Plaintiff asserts that Ullman hid the fact from Holkovic that no blacks or women had reported being offended by plaintiff's comments, and that she did not report that Zenbauer, Chyben, Golden, and Gray were all younger white males who had made age-based slurs against plaintiff and wanted to get him terminated.  The lack of offense taken has been previously addressed.  Additionally, as set forth above, three of these individuals were well over age 40.  Regardless, there is no evidence that they made age-based slurs.  And, as discussed above, the fact that they may have wanted him terminated had nothing to do with age.

Plaintiff contends that even after he was terminated, the compliance hotline complaints

continued.  But even according to plaintiff, only two additional complaints were received.

Finally, the burden remains on plaintiff to show that age was the "but-for cause" of his termination.  Not only has he not presented any evidence of age-bias, but the evidence shows otherwise.  Plaintiff was hired by defendant at the age of 53, and promoted at ages 63 and 71. Martin, Holkovic, and Fogleman, who had promoted plaintiff to his managerial position, were the same ones who participated in the decision to terminate him.  Additionally, as of the date of plaintiff's termination, approximately 79% of the employees supervised by plaintiff were over age 50 and 29% were over age 60.  (Ullman aff.)  There is no evidence to show that age was the reason for plaintiff's termination.

For these reasons, plaintiff fails to demonstrate pretext.

**<u>Conclusion</u>**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.


       /s/ Patricia A. Gaughan
       PATRICIA A. GAUGHAN
       United States District Judge

Dated: 1/15/13